447 So.2d 513 (1984)
Jack FISHMAN
v.
Harriet Howard Wife of/and Joe HOWARD, State Farm Mutual Automobile Insurance Company and Maryland Casualty Insurance Company.
No. CA 0285.
Court of Appeal of Louisiana, Fourth Circuit.
February 17, 1984.
*515 Marvin C. Grodsky, New Orleans, for plaintiff-appellant.
Robert J. Neal, New Orleans, for defendant-appellee.
Before GARRISON, BARRY and BYRNES, JJ.
GARRISON, Judge.
This is an appeal from a judgment of the district court granting to plaintiff damages in the amount of $15,000.00 under plaintiff's underinsured motorist coverage with Maryland Casualty Company. The trial judge provided the following written reasons for judgment:
"Maryland's policy was issued on August 16, 1977, before the effective date of Act 623 of 1977. Although the policy period commenced September 13, 1977, after the effective date of the Act, the policy was a contract between the parties when issued, and could not be effected by subsequent legislation. Consequently the stacking prohibition of Act 623 is not applicable and the limits should be stacked.
The u.m. selection form admits of no interpretation other than the insured's intent to purchase limits of 5/10 thousand as in fact the policy provided.
All bills incurred for treatment contemplated within one year have been paid, and nothing further is due under the medical payments coverage of the policy.
Since the quantum of damages (sic) exceeds the insurance limits of $115,000.00 judgment will be rendered against Maryland in the sum of $15,000.00"
From that judgment, which we reverse, plaintiff appeals.

FACTS
In 1974, Mr. Fishman had a policy of automobile insurance with Maryland Casualty Co. The policy provided for limits of $300,000.00. In September of 1974, Fishman's insurance agent sent him the form at issue in this case. Thereafter two additional vehicles were added to the policy, which was renewed at each subsequent anniversary date and through the date of the accident.
On December 2, 1977, plaintiff's vehicle was "rear-ended" by a vehicle driven and owned by Harriet Howard. In conjunction therewith, plaintiff filed suit against Harriet Howard and her insurer, State Farm Mutual Automobile Insurance Co., as well as his U/M carrier, Maryland Casualty Co. Prior to trial, Harriet Howard and State Farm settled with plaintiff. Accordingly, the case went to trial solely against Maryland Casualty.
On appeal, plaintiff raises the following specifications of error:
1. The court erred in finding that "the uninsured motorist selection form admits of no interpretation other than the insured's intent to purchase limits of 5/10 thousand".
2. The court erred in finding that the uninsured motorist selection form was unquestionable in light of plaintiff's testimony.

*516 3. The court erred in applying retroactively the 1975 amendment to LSA-R.S. 22:1406 which made uninsured motorist rejections or selections of lower limits applicable to subsequent renewals.
4. The court erred in finding that no further medical payments are due under the policy for treatment of injuries sustained in the accident but for which bills were not issued until after December 2, 1978, under a one-year limit contained in the policy.

I. The U.M. Selection Form
Plaintiff's insurance agent sent plaintiff the following form:

*517 At the time that the form was sent, there was no "x" in the "5/10" box as presently appears above. Mr. Fishman signed the blank form and returned it to his agent. The agent put the "x" in the box next to the "5/10" limits.
Plaintiff did not check any of the boxes or otherwise indicate a choice to select liability limits higher, lower, or equal to the $300,000 policy that he maintained on his vehicle. The agent also dated the form "9/13/74".
The trial court found that the form evidenced a clear intent of plaintiff to select lower limits. We do not agree. First it should be noted that there is no check, "x" or other evidence of selection on any of the three main subdivisions on the form. Secondly, Mr. Fishman made no selection.
Act No. 154[1] of 1974 amending R.S. 22:1406 provided as follows:
"Section 1406. Specific duties of casualty and surety insurance division
* * * * * *
D. (1) No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy, under provisions filed with and approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom; provided, however, that the coverage required under this section shall not be applicable where any insured named in the policy shall reject the coverage or selects lower limits.
* * * * * *
(2) For the purposes of this coverage the term uninsured motor vehicle shall, subject to the terms and conditions of such coverage, also be deemed to include an insured motor vehicle when the automobile liability insurance coverage on such vehicle is less than the amount of damages suffered by an insured and/or the passengers in the insured's vehicle at the time of an accident, as agreed to by the parties and their insurers or as determined by final adjudication." (emphasis added)
In the instant case, Fishman neither selected nor rejected. By the terms of the Act, as well as by Maryland's own recitation on the form, the policy must be deemed to have been issued with UM coverage equal to "the limits of bodily injury liability provided by the policy."
We further note that the form at issue is clearly ambiguous and as such should be construed against Maryland. Accordingly, we find that the trial court committed an error of law on this issue.

II. Retroactivity
In light of our discussion on the above issue, the question of retroactivity is no longer an issue and will not be discussed.

III. Liability
Although neither side has briefed this issue, this Court, after thorough examination of the record before us realizes that there has been no evidence presented on the question of negligence/liability. Mr. Fishman's testimony deals with the form, medical aspects, and quantum, but there is no testimony on how, where or by whose fault the accident occurred. Neither Harriet Howard, Joe Howard, or Lionel Royal[2] were called to testify.
*518 The only "testimony" dealing with the negligence/liability aspects is found in statements by the attorneys, prior to the time when the first witness, Mr. Fishman, was called:
"MR. THOMPSON:
My name is Jim Thompson representing Harriet Howard, Joe Howard and State Farm. And Mr. Birdsall is here representing Lionel Royal and it has been agreed upon between the parties that we have reached a compromise settlement of this case in the amount of $40,000 to be paid by State Farm Mutual Automobile Insurance Company in exchange for a complete receipt and release, releasing Harriet Howard, Joe Howard and State Farm as well as a complete motion to dismiss with prejudice. And the documents will be forthcoming in the near future. Thank you, sir." (Tr. p. 2)
"Mr. Neal:
Defendants will stipulate that on December 2nd, 1977, Mr. Jack Fishman was operating a 1969 Cadillac owned by him when this vehicle was struck in the rear approximately 3:30 p.m. on Interstate 10 Highway near the Cleveland Avenue exit. I think that would suffice as far as the facts were concerned." (Tr. p. 3).
"Mr. Neal:
It is further stipulated between counsel for the purposes of this record that Mr. Fishman has settled his case with the primary liability carrier, that is, the carrier of Harriet Howard.
Mr. Grodsky:
That being State Farm.
Mr. Neal:
Which is State Farm Mutual Automobile Insurance Company and has settled with that Company for their full policy limit of $100,000. Further, I would like at this time to offer and introduce and file into evidence a certified copy of the policy of insurance issued to Jack Fishman marked for identification as Maryland No. 1." (Tr. p. 4).
It has repeatedly been held that a settlement or compromise is not an admission of liability. Belanger v. Employers Mut. Liab. Ins. Co. of Wisc., 159 So.2d 500, (La.App. 1st, 1963) writ denied 162 So.2d 8, 245 La. 949 (1964); Broussard v. State Farm Mut. Auto. Ins. Co., 188 So.2d 111 (La.App. 3rd, 1966) writ denied 190 So.2d 233, 249 La. 713, (1966) cert. denied 386 U.S. 909, 87 S.Ct. 855, 17 L.Ed.2d 783. Launey v. Thomas, 379 So.2d 27 (La.App. 3rd, 1979) writ denied 381 So.2d 1233 (1980); Herbert v. Ordoyne, 388 So.2d 407 (La.App. 1st, 1980). The written compromises later filed into the record of this matter do not admit liability or negligence.
State Farm, the insurer of Harriet Howard and Joe Howard denied liability in its answer filed January 31, 1979. Additionally, Maryland Casualty Co. generally denied liability, specifically alleged that the sole and proximate cause of the accident was the negligence of Jack Fishman, alternatively alleged that Fishman was contributorily negligent, and lastly asserted a third-party *519 demand against the Howards and their insurer. Finally, on July 10, 1980 Maryland's motion to dismiss with prejudice its third-party demand against the Howards and State Farm was granted.
The trial judge impliedly ruled on the question of negligence because his award of $15,000.00 presupposes a finding of negligence for which liability attaches. Other than Mr. Neal's statement at page 2 of the transcript quoted above, there is no evidence on which a finding of negligence could be based. Thus, it falls upon this court to determine if Mr. Neal's statement is an admission of liability. We find that it is not such an admission by its plain import.
In the absence of any proof, we can only conclude that the trial court committed an error of law in assuming liability.
Accordingly, this issue will be remanded to the trial court for further evidence or a stipulation on this issue.[3]
Because the medical payments provision of the policy is independent of any negligence assessment, we will address that issue next.

IV. Medical Expenses
Plaintiff argues that the trial court erred in failing to award damages for medical expenses charged or billed after December 2, 1978. Plaintiff's policy contained the following provision:
"Coverage CMedical Payments: To pay all reasonable expenses incurred within one year from the date of the accident for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services." (Emphasis added)
In the instant case, plaintiff consulted Dr. John E. Linder four days after the accident for pains in the left leg, buttocks, neck and lower back, diagnosed as acute cervical-thoracic-lumber sprain and a possible ruptured disc. He was treated by Dr. Linder with ultrasonic therapy, analgesics, muscle relaxants, and home heat treatments through February 15, 1978. At the time of discharge, plaintiff still experienced occasional pain. Dr. Linder further stated that he told plaintiff that intermittent pain would occur as plaintiff is elderly and degenerative arthritis changes are normal in someone his age. No x-rays were ordered while plaintiff was under Dr. Linder's care.
On July 2, 1979, plaintiff, who was still suffering from pain in the left leg, consulted Dr. Nick J. Accardo who diagnosed asceptic necrosis at the head of the left femur. Dr. Accardo testified that while the range for manifestation of asceptic necrosis may be as long as from two months to two years, it is normally manifest within three months of the accident, although symptoms indicating that "something" is wrong will occur immediately. Dr. Accardo testified that he believed the symptoms of asceptic necrosis were manifest from the date of the accident, although he did not wish to criticize the diagnosis of another doctor. Dr. Accardo further testified that plaintiff suffered from severe asceptic necrosis which would not benefit from conservative treatment. Accordingly, he recommended a surgical total hip replacement, which was performed on August 22, 1980.[4] The language contained in plaintiff's policy is the exact same language found in Valladares v. Monarch Insurance Co., 282 So.2d 569, 572 (La.App. 4th, 1973). In Valladares, this court found that an expense was "incurred" within one year from the date of the accident where:
(1) the injury manifests itself within one year of the accident,

*520 (2) the insurer is aware of the nature of the injury,
(3) the insured approaches a physician and obtains a diagnosis and recommended course of treatment prior to the expiration of one year from the date of the accident, and,
(4) the treatment cannot successfully be completed within the one year period.
Maryland argues that no medical payments are owed under Valladares and its progeny because:
"(1) appellant complained of left leg pain when seen by Dr. Lindner, therefore it is possible the injury manifested itself within one year, however,
(2) the only injury Maryland was aware of was a soft tissue injury to the back treated by Dr. Lindner and Dr. Lindner was not aware of the nature of the leg injury,
(3) the diagnosis and recommended surgery was not until 17 months following the accident, and,
(4) had Mr. Fishman consulted a specialist timely, in all likelihood the diagnosis would have been made within one year whether the surgery would have been performed within one year or not." (Maryland's Brief, P. 9-10)
We do not agree. Maryland tentatively concedes that the injury manifested itself within one year. Based upon Dr. Accardo's testimony, we agree on that point.
On point number two, Maryland argues that it was not aware of the nature of the injury, as it believed the injury was a soft tissue one. We note that neither the injured party nor his physician at that time knew the true nature of the injury. Accordingly, there was no one with that knowledge to inform Maryland. We find that criteria number two under Valladares, does not require an exact diagnosis. The purpose of this provision is to give notice to the insurance company that an injury exists, where such notice is practical. In the instant case, Maryland was notified that an injury existed and was given the diagnosis available at the time. We find that criteria number 2 was met in light of the facts as they existed at the time of notification.
Criteria number 3 under Valladares is "the insured approaches a physician and obtains a diagnosis and recommended course of treatment prior to the expiration of one year from the date of the accident." In the instant case, plaintiff approached Dr. Lindner, obtained a diagnosis, and recommended course of treatment. Unfortunately, the diagnosis and course of treatment prescribed were not exactly "on target." This court realizes that the practice of medicine is an art and not a science. We further recognize that symptoms may indicate a number of possible different diseases or injuries and that diagnosticians sometimes face a difficult task in isolating which condition does in fact exist and which symptom is only masking another symptom or condition.
In the instant case, the diagnosis obtained was not correct, however we do not think that a plaintiff-layman should be held to the same standard of knowledge as a diagnostician. Plaintiff met the requirements of criteria number 3, however the diagnosis obtained was incorrect.
Maryland argues "had Mr. Fishman consulted a specialist timely" a correct diagnosis would have been made within a year. Based on Dr. Accardo's testimony that Mr. Fishman's asceptic necrosis existed as a result of and from the time immediately after the accident, Maryland's argument is probably a fairly accurate factual supposition. There is, however, no requirement that plaintiff consult a specialist in addition to the treating physician he had already consulted. Dr. Linder told plaintiff that although his treatment was completed, plaintiff would continue to suffer intermittent pain and plaintiff had a right to rely upon his physician's judgment. It is incumbent upon the treating physician to recommend consultation with a specialist, where in the exercise of his professional judgment, the treating physician deems it necessary. We further note that any communications *521 between plaintiff and Dr. Lindner are subject to the physician-client privilege and as such are personal defenses to the plaintiff which may not be raised by the insurer.
Accordingly, we find the policy covers plaintiff's later surgeries and expenses in conjunction with and related thereto,[5] but for a bill for $490.00 from Dr. Dorsey W. Dysart as is discussed below. Accordingly we find that plaintiff is owed $22,510.00 in medical payments.

V. Dr. Dysart's Bill
Dr. Dorsey W. Dysart was consulted by plaintiff on January 23, 1979 for neurological evaluations. Dr. Dysart was not called as a witness at the trial. There is scant evidence of Dr. Dysart contained in the record. Accordingly, this court does not know whether plaintiff was referred to Dr. Dysart by Dr. Accardo in conjunction with the surgery or whether the consultation is related to the instant accident in any way whatsoever. Due to the lack of evidence contained in the record, we find that plaintiff failed to prove that Dysart's bill was "incurred" as required under Valladares, above.

VI. Attorney's Fees and Penalties on Maryland's Failure to Pay

A. Failure to Pay under Medical Coverage (C)
R.S. 22:657(A) provides as follows:
"A. All claims arising under the terms of health and accident contracts issued in this state, except as provided in Subsection B, shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent business man on his guard, exist. The insurer shall make payment at least every thirty days to the assured during that part of the period of his disability covered by the policy or contract of insurance during which the insured is entitled to such payments. Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court. The district court of the parish where the insured lives or has his domicile shall have jurisdiction to try such cases."
Plaintiff argues that under the above quoted statute, he should be awarded penalties and attorney's fees.
Maryland's interpretation of its policy in light of the Valladares criteria was a valid one, which we might add was very well presented. Although this court did not agree with Maryland's argument, it was a valid argument. If this court had agreed, then under its policy Maryland would have only owed Dr. Lindner's bill of $375.00, which had already been paid. Although Maryland's policy provision has been previously interpreted, it has not been interpreted in the context of an erroneous diagnosis. The insurer has a right to rely on its defenses and Maryland had a right to test its interpretation before this court when there is no prior interpretation dealing with an erroneous diagnosis. Accordingly, we cannot conclude that Maryland acted arbitrarily, capriciously, and unreasonably in failing to pay for the additional medical bills under Coverage C of the Medical Payments Provision.

B. Failure to Pay Under Uninsured Motorist Coverage (G) and

R.S. 22:658, Quantum; Stacking
Because of this court's prior finding on the negligence/liability aspect, it would be *522 inappropriate to discuss this issue, as well as the issues of quantum and stacking.
For the reasons discussed, the judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with the findings herein.
REVERSED AND REMANDED.
NOTES
[1] Act 154 of 1974 was approved by the Governor on July 9, 1974.
[2] Upon seeing the name "Lionel Royal" this court realized that from the record before us, we had no knowledge of who Lionel Royal was or how he was connected to the instant case. He was neither a party nor a witness and his name was not mentioned in any other place in the entire record.

Upon examining the front page of the first volume of testimony, this court noticed the language "Consolidated with No. 78-00480." No motion or order to consolidate was contained in the record before us. Upon its own motion, this court ordered the record in Civil District Court Case No. 78-00480 and discovered the following.
Lionel Royal was a guest passenger in the vehicle driven by Jack Fishman. Additionally, Royal was an employee of Fishman's Cottman Transmission franchise. Apparently Fishman and Royal were on a business errand when the accident occurred. Royal's petition failed to allege that his injuries were the result of Fishman's negligence, hence Fishman was dismissed as a party defendant. Additionally, the petition failed to assert a cause of action against Cottman and Cottman was also dismissed as a party defendant leaving only the Howards and their insurer, and Maryland Casualty Co., Mr. Fishman's U.M. insurer. The two cases were consolidated prior to trial and Lionel Royal's suit was compromised prior to the time when the first witness took the stand, as quoted above. On August 5, 1980 a joint motion to dismiss by Lionel Royal and Maryland on the basis of settlement was granted in No. 78-00480.
Upon our independent examination of the record in Case No. 78-00480, we find no admission of or stipulation to liability and no evidence on the question of negligence.
[3] The trial judge who handled this matter is an astute judge and this court fears that perhaps an informal agreement to stipulate to or admit liability was made and was inadvertently omitted from the record. We note that a number of exhibits were lost and had to be stipulated to in this court.
[4] Counsel for plaintiff further states in his brief that some seven months later, plaintiff was re-admitted to the hospital for repositioning and recementing of the implanted prosthesis.
[5] Plaintiff and defendant stipulated plaintiff's medical bills to be $23,000.00. $23,000.00-$490.00 = $22,510.00.